IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

ROBERT J. STEVENS, *et al.*,        )
                                    )
    Plaintiffs,                 )
                                    )
    v.                          )        Case No. 1:12-cv-1105 (GBL/IDD)
                                    )
ERIC H. HOLDER, JR.,                )
*in his official capacity as Attorney General of*  )
*the United States, et al.*,        )
                                    )
    Defendants.                 )

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Motion to Dismiss and Motion for

Summary Judgment. (Docs. 37, 38.) This case concerns claims by two former Federal Bureau

of Investigation ("FBI") trainees who were terminated from the FBI Academy. Plaintiffs allege

their termination from the FBI Academy resulted from violations of their constitutional rights of

privacy and due process, and also allege violations of the Fair Labor Standards Act ("FLSA")

resulting from non-compensation for certain work-related tasks.

Defendant's Motions present three issues. The first issue is whether the Government

violated Plaintiffs' substantive due process rights in that the FBI's decision to terminate

Plaintiffs after learning of their relationship violated a Fifth Amendment right to engage in a

personal romantic relationship with one another at work. The second issue is whether Plaintiffs

state an equal protection claim on the grounds that the FBI terminated Plaintiffs for conduct code

violations yet treated differently other trainees who violated conduct regulations. The third issue

is whether Plaintiffs state a claim pursuant to the FLSA by alleging that the FBI refused to

compensate Plaintiffs for certain tasks performed during their time at the FBI Academy.

The Court grants Defendant's Motions for three reasons. First, the Fifth Amendment does not provide a fundamental right to engage in a non-marital, non-familial, non-sexual personal relationship, thus the Government's rules affecting personal relationship conduct on government property does not violate substantive due process. Second, Plaintiffs fail to plead sufficient facts demonstrating that other individuals in receipt of different treatment were similarly situated, resulting in an equal protection violation. Furthermore, Plaintiffs fail to plead facts demonstrating that any differential treatment was not justified, in light of the fact that the Government may promulgate rules limiting or proscribing employee conduct. Third, Plaintiffs' FLSA claim fails because the tasks at issue were not either "productive work" nor assignments regularly scheduled in advance of the administrative workweek, requirements for FLSA violations in the context of entry-level employees.

## I.  BACKGROUND

Plaintiffs Robert Stephens and Katherine Hayek bring this action against Eric Holder, Jr. in his official capacity as Attorney General, concerning a series of events occurring while the Plaintiffs were FBI trainees. Plaintiffs entered the FBI New Agent Training ("NAT") program in Quantico, Virginia on July 17, 2011. (2d Am. Compl. ¶¶ 19-20, Doc. 32.) Special Agent (SA) Michael Robinson and Special Supervisory Agent (SSA) Derrick Edmond conducted orientation for the New Agent Class (NAC), during which time the trainees completed personnel documents. (*Id.* ¶¶ 21-22.)

At the time they entered the FBI Academy, Plaintiffs were married, yet separated from their respective spouses. On August 10, 2010, Mr. Stevens separated from his wife, although the divorce was not final until December 31, 2011. (*Id.* ¶ 17.) Ms. Hayek separated from her husband on July 15, 2011, with their divorce becoming finalized on October 4, 2011. (*Id.* ¶ 18.)

2

The parties were terminated from the FBI Academy in September 2011. Plaintiffs were legally married, yet separated, during the time period relevant to their claims.

Plaintiffs became acquainted on July 29, 2011 and developed a romantic relationship. (*Id.* ¶ 25.) Plaintiffs did not hide their relationship, believing it was not unlawful or inconsistent with FBI policy. (*Id.* ¶ 26.) During their time as NATs, Plaintiffs resided in dormitories on FBI property. (*Id.* ¶ 27.) On September 16, 2011, SA Robinson and SA Christine O'Neil searched Ms. Hayek's dorm room, and the ensuing report reported finding men's jeans and deodorant in Ms. Hayek's room. (*Id.* ¶¶ 31-32.) The report also indicated that SA Robinson and SA O'Neil reported their findings to SSA Edmond. (*Id.* ¶ 33.)

Plaintiffs allege that in late September, the FBI interviewed Plaintiffs and other trainees about Plaintiffs' relationship. (*Id.* ¶ 34.) SSA Edmond, joined by SSA Thomas Bailey, SSA Steven Hayes, and SA Robinson, held separate interviews with Plaintiffs to determine whether Plaintiffs violated the honor code by cheating on exams. (*Id.* ¶¶ 35-36.) In each meeting, the questions would eventually shift from the exams to Plaintiffs' relationship. (*Id.* ¶¶ 37-40.) In discussing Plaintiffs' relationship, SSA Edmond allegedly approached the subject of Plaintiffs' marital status and told Mr. Stevens to do some soul searching. (*Id.* ¶¶ 40-41.)

In a second meeting with Mr. Stevens the following day, September 27, 2011, SSA Edmond cleared Mr. Stevens of the honor code violation charge, but further inquired as to the nature of Plaintiffs' relationship. (*Id.* ¶¶ 43-46.) The same day, a similar interaction occurred between SSA Edmond and Ms. Hayek. (*Id.* ¶ 47.) SSA Edmond expressed his disapproval for extramarital affairs, allegedly telling Ms. Hayek that Plaintiffs' relationship was a "poor choice." (*Id.* ¶¶ 48-49.) Later that evening, SSA Edmond met with Plaintiffs individually to inform then that the FBI would conduct a "Suitability Review" to determine Plaintiffs' fitness for duty as FBI

agents. (*Id.* ¶ 51.) Plaintiffs received a "Counseling Statement" alleging that they violated curfew, and lacked integrity and good judgment in entering into a personal relationship. (*Id.* ¶ 53.) SSA Edmond subsequently conducted interviews with other trainees on the topic of Plaintiffs' relationship. (*Id.* ¶¶ 54-57.)

Plaintiffs allege SSA Edmond used the curfew violations as pretext for terminating Plaintiffs for their relationship. (*Id.* ¶ 60.) SSA Edmond, SA Robinson, and Acting Unit Chief (AUC) Melinda Casey informed Mr. Stevens that they completed the Suitability Review and found him unsuitable for duty. (*Id.* ¶ 60.) AUC Casey indicated to Mr. Stevens that he was terminated for more than just a curfew violation; Plaintiffs allege that she implied that real reason was the relationship with Ms. Hayek.[1] (*Id.* ¶ 64.) Ms. Hayek was terminated the same day for a curfew violation. (*Id.* ¶ 66.) When Ms. Hayek protested the finding that she broke curfew, AUC Casey replied that Ms. Hayek was terminated for allowing Mr. Stevens to break curfew. (*Id.* ¶¶ 67-68.) A written "Counseling Record," summarizing the FBI's Suitability Review, stated that Plaintiffs failed to demonstrate three "suitability dimensions": emotional maturity, integrity, and judgment. (*Id.* ¶ 69.) Plaintiffs allege that these infractions arose from their personal relationship, not the curfew violation. (*Id.*) Mr. Stevens's formal termination form, dated September 30, 2011, noted that Mr. Stevens also failed the suitability requirement for "conscientiousness." (*Id.* ¶ 70.)

On September 30, 2011,[2] an unknown individual allegedly sent letters to Plaintiffs'

---

[1]    Plaintiffs do not specify or otherwise present any more specific allegations indicating what AUC Casey said or did to convey such implication.

[2]    The Second Amended Complaint alleges that the letters were sent on September 30, 2012. (2d Am. Compl. ¶ 86.) However, being that the subsequent paragraphs allege the letters were read October 2011—and the fact that this suit was first filed October 1, 2012—the Court will presume that the letters were actually sent in September of 2011.

respective estranged spouses disclosing Plaintiffs' sexual relationship at the FBI Academy. (*Id.* ¶¶ 86-88.) Purportedly sent by a concerned NAT at the FBI Academy, the letters informing Plaintiffs' estranged spouses that Plaintiffs were violating a strict rule prohibiting sexual relations on government property and were "sleep[ing] together almost every night." (*Id.* ¶¶ 89-92.) The letters further stated that Plaintiffs violated rules concerning sex on government property and violated the pillars of the FBI. (*Id.* ¶¶ 93-94.) Plaintiffs dispute the truth of the letters' contents. (*See id.* ¶¶ 92-96.)

Plaintiffs claim that their termination on suitability grounds has damaged their ability to find other meaningful employment opportunities. (*Id.* ¶ 100.) Mr. Stevens is allegedly under-employed now, having previously been unemployed for eleven months after leaving the FBI Academy, as a result of the FBI dismissal and having to disclose the circumstances surrounding his termination. (*Id.* ¶¶ 101-03.) Two potential employers informed Ms. Hayek that she was denied employment solely because of her termination from the FBI. (*Id.* ¶ 104.) However, she is now employed with the Defense Contract Audit Agency, a hire that was delayed while the agency consulted the FBI regarding her termination. (*Id.* ¶¶ 105-06.) Plaintiffs allege that they both seek work in fields where potential employers will likely to use the FBI Suitability Review to make their own security-clearance decisions, thus creating a unique harm by the FBI's decision. (*Id.* ¶ 107.) Plaintiffs further maintain that the poison-pen letters caused them harm during their respective divorce proceedings through a loss of bargaining power. (*Id.* ¶ 108.)

Unrelated to Plaintiffs' personal relationship and subsequent termination, Plaintiffs further alleged that they were eligible for and entitled to overtime compensation that they did not receive while training at the FBI Academy. (*Id.* ¶ 109.) The NATs received a take-home exam on Friday, September 16, 2011, to complete during the ensuing weekend. (*Id.* ¶ 110.) Plaintiffs

allege that their supervisors intentionally extended deadlines to Tuesday to fall within FSLA requirements, but kept Plaintiffs fully occupied during the workday with other assignments so that Plaintiffs effectively could not complete the assignment during working hours. (*Id.* ¶¶ 114-16.) Plaintiffs also allege that the NATs were regularly required to spend an extra hour cleaning and preparing gym equipment three days per week, and their supervisors ordered all NATs to list only forty hours of work on their timesheets. (*Id.* ¶¶ 117-19.)

On February 25, 2012, Mr. Stevens filed a formal Complaint of Discrimination with the Department of Justice, alleging that the FBI discriminated against him based on his marital status. (Def.'s Ex. 5, Doc. 46-1; Def.'s Ex. 3 at 1, Doc. No. 39-3.) The DOJ dismissed the complaint on June 14, 2012, finding that federal Equal Employment Opportunity laws and policies did not protect Stevens' marital status. (Def.'s Mem. at 6; Def.'s Ex. 3 at 1.) On appeal, the Equal Employment Opportunity Commission within the Office of Federal Operations found that the DOJ correctly dismissed Stevens' discrimination claims but remanded for a full investigation regarding Plaintiff's reprisal claims. (Def.'s Ex. 3 at 2-3.)

Plaintiffs filed this action on October 1, 2012, seeking injunctive relief and compensatory and punitive damages for constitutional and statutory violations arising out of their employment termination and unpaid overtime compensation. Plaintiffs filed an Amended Complaint on January 11, 2013, alleging seven counts, premised on a right to privacy, due process, the Privacy Act, unlawful search in violation of the Fourth Amendment, and the FLSA. (*See* Am. Compl. ¶¶ 149-88, Doc. 32.) The Amended Complaint named as defendants the FBI and seven FBI employees in their individual capacities: SA Michael Robinson, Training Division Assistant Director Thomas Browne, SSA Derrick Edmond, AUC Melinda Casey, SA Christine O'Neil,

and the unnamed individual who sent the poison-pen letters.[3]  (*See id.* at 1.)  On April 19, 2013, the Court dismissed all counts for failure to state a claim.  (Doc. 31.)

Plaintiffs filed their Second Amended Complaint on May 10, 2013, this time naming only Attorney General Holder, in his official capacity, and John Doe as defendants.  Plaintiffs re-allege many of the same facts, although with less detail in certain instances than the First Amended Complaint.  The Second Amended Complaint presents five counts.  The first two counts relate to Plaintiffs termination in violation of substantive due process and equal protection of their Fifth Amendment right to privacy.[4]  The third and fourth counts are against John Doe in relation to the "poison-pen letters," seeking relief for a violation of procedural due process and defamation.  The fifth count, in asserting the FLSA claim, seeks relief for working uncompensated overtime hours.  (*See* 2d Am. Compl. ¶¶ 120-51.)

The Government filed this Motion to Dismiss and Motion for Summary Judgment on May 24, 2013.  (Docs. 37, 38.)  The Government seeks dismissal for failure to state a claim on Counts I, II, and V, alleged against the FBI.  Additionally, the Government seeks summary judgment on Count I, the substantive due process claim, based not only on the contents of FBI regulations, but also because the Second Amended Complaint "purposefully scrubbed" the allegations regarding the FBI rules and procedures governing curfew and prohibiting students from sleeping in the same dorm room.  (Def.'s Mem. at 10.)  This fact, the Government argues, is not in dispute because it is integral to the Second Amended Complaint and the facts

---

[3]      Plaintiffs' initial Complaint named as a defendant SSA Bailey and did not name as defendants AUC Casey and SA O'Neil.

[4]      The basis for the due process allegations in the Second Amended Complaint differ in the sense that the First Amended Complaint argued that Plaintiffs were entitled to a formal hearing and opportunity to respond prior to termination.  The Second Amended Complaint omits any claim of right to such a hearing.

concerning these rules are beyond dispute based on the allegations in the previous complaint, admissions during prior oral argument, and the dismissal of the First Amended Complaint. (*Id.*)

## II. STANDARDS OF REVIEW

### A. *12(B)(6) Motion to Dismiss Standard of Review*

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) should be granted unless the complaint "states a plausible claim for relief" under Rule 8(a). *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In considering a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). No such assumption of truth is afforded to those "naked assertions" and "unadorned conclusory allegations" devoid of "factual enhancement." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citations omitted). Nor is the court obligated to assume the veracity of the legal conclusions drawn from the facts alleged. *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (citing *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979)). In addition to the complaint, the Court also examines "documents incorporated into the complaint by reference," as well as those matters properly subject to judicial notice. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) (citations omitted); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

The complaint must contain sufficient factual allegations, taken as true, "to raise a right to relief above the speculative level" and "nudge [the] claims across the line from conceivable to

plausible." *Vitol*, 708 F.3d at 543 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The facial plausibility standard requires pleading of "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck*, 708 F.3d at 554 (quoting *Iqbal*, 556 U.S. at 678). The plausibility requirement imposes not a probability requirement but rather a mandate that a plaintiff "demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Thus, in order to survive a Rule 12(b)(6) motion to dismiss, the complaint must present sufficient non-conclusory factual allegations to support reasonable inferences of the plaintiff's entitlement to relief and the defendant's liability for the unlawful act or omission alleged. *See id.* at 196-97 (citing *Iqbal*, 556 U.S. at 678-79 and *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc)).

### B. Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmoving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 247-48).

A "material fact" is a fact that might affect the outcome of a party's case. *Liberty Lobby*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. ANALYSIS

The Court grants Defendant's Motions and dismisses Plaintiffs' claims for three reasons. First, Defendant is entitled to summary judgment on Plaintiffs' due process claim because Plaintiffs did not have a fundamental right to a romantic relationship that was unconstitutionally burdened by FBI regulations. Second, Plaintiffs fail to state an equal protection claim where the allegations do not present differential treatment of similarly situated individuals or that such treatment was not rationally related to a government objective. Third, Plaintiffs fail to state a

claim for overtime pay under FLSA where they do not meet the elements required for entry-level employees to receive overtime compensation.

### A. Plaintiffs' Substantive Due Process Claim

The Court grants Defendant's Motion for Summary Judgment on Count I because Plaintiffs do not have a constitutional right to engage in a personal relationship while on government property and the evidence before the Court illustrates Plaintiffs' violation of the FBI's permissible limitations on employee conduct.[5]

The Fifth and Fourteenth Amendments to the Constitution guarantee "due process of law" for any deprivation of "life, liberty, or property." U.S. Const. amend. V, XIV. The Due Process Clause addresses not only those procedures used in connection with such deprivations but also contains a "substantive component." *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846-47 (1992) (citations omitted). Substantive due process "'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). These protected rights and interests include those not specifically enumerated by the Constitution but "are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21 (internal quotation marks and citations omitted). Where the right asserted is deemed fundamental, only those infringements

---

[5]    The Government moved for summary judgment on Count I and, in doing so, relied upon their submission of the FBI's regulations governing NATs and Mr. Stevens's EEO complaint regarding his termination. (*See* Def.'s Mem. at 10-11; Def.'s Reply at 4.) Plaintiffs offered no objection or response to the submission of these documents or addressed the Government's Rule 56 motion or arguments. Because Plaintiffs had notice of the Government's intent to argue this Motion as one for summary judgment and the parties have had discovery on this matter, the Court will consider Count I under a summary judgment standard.

narrowly tailored to serve a compelling government interests will be permitted. *Id.* at 721.

Where a fundamental right does not exist, courts review government action under the rational

basis standard. *Id.* at 728; *Traficanti v. United States*, 227 F.3d 170, 175 (4th Cir. 2000) (citation

omitted).

Thus, the Court's analysis of Plaintiffs' due process claim will involve two steps.  The

first step is a determination of whether Plaintiffs assert a fundamental right, a determination that

requires a careful description of the asserted liberty interest. *Workman v. Mingo Cnty. Bd. of

Educ.*, 419 F. App'x 348, 355 (4th Cir. 2011) (citing *Glucksberg*, 521 U.S. at 720).  The second

step is the application of the proper level of scrutiny, be it strict scrutiny or rational basis

review.[6] *Id.* (citing *Glucksberg*, 521 U.S. at 720).

---

[6]     The Court notes that it applies this two-step review despite some room for argument as to
the applicability of this standard to these facts.  The Court uses the two steps as presented
because the parties argued Defendant's Motion under this standard and at no point suggested the
applicability of the alternative substantive due process framework set forth in *County of
Sacramento v. Lewis*, 523 U.S. 833 (1998)).  As the Fourth Circuit explained, *Lewis* identified
the existence of two methods of analysis for determining arbitrariness in the context of
substantive due process, turning on whether the challenged action was executive or legislative in
nature. *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (citing *Lewis*, 523 U.S. at 846).
*Hawkins* indicated that the two-step process presented by Plaintiffs—determining whether a right
is fundamental and thereafter applying the appropriate level of scrutiny—applies where "the
claimed violation is by legislative enactment." *Id.* at 739 (citing *Glucksberg*, 521 U.S. at 720-21,
728).  Where the violation arises from executive action, courts must address, as a threshold
matter, "whether the challenged conduct was 'so egregious, so outrageous, that it may fairly be
said to shock the contemporary conscience.'" *Id.* at 738 (quoting *Lewis*, 523 U.S. at 846-47 &
n.8).  Where an executive act fails to meet the shock-the-conscious test, courts need not ascertain
the nature of the asserted liberty interest and whether such interest is a fundamental one. *Id.*

       While the adverse actions here were not legislatively enacted, the Government at no point
challenged Plaintiffs' arguments under the *Glucksberg* test.  Furthermore, the Fourth Circuit has
used the *Glucksberg* inquiry in a case where an employee of a government agency challenged an
internal anti-nepotism policy as a significant infringement on the fundamental right to marry.
*See Woodard v. County of Wilson*, 393 F. App'x 125, 127-28 (4th Cir. 2010); *Waters v. Gaston
Cnty., N.C.*, 57 F.3d 422, 425 (4th Cir. 1995).  Thus, while the act taken was not one caused by
legislative enactment, it is not entirely clear that, in this circuit, employment termination under
an internal conduct policy of a government agency should be subject to the executive action
standard of *Lewis*. *But see Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 749-51 (10th

12

*1.  Plaintiffs Fail to Assert a Fundamental Right*

For the reasons stated below, the Court defines the asserted right as a Fifth Amendment right to engage in a non-marital, non-familial romantic relationship exists.  This is not a fundamental right implicit in the right to privacy captured by the Due Process Clause.

Although the Constitution does not explicitly mention a right to privacy aside from the Fourth Amendment's search and seizure context, the Supreme Court has recognized a right to personal autonomy, containing the right to "intimate associations," implicit in the Due Process Clause of the Fourteenth Amendment.[7]  *Roe v. Wade*, 410 U.S. 113, 152 (1973).  This right to

---

Cir. 2013) (applying the "shocks the conscience" test for executive action to claims alleging unconstitutional termination from public employment on the basis of the plaintiff's disability).

Were the Court to apply the *Lewis* standard, Plaintiffs' claims would fail as a matter of law, without ascertaining the nature of the asserted right, because Plaintiffs' firing does not "violate[] the 'decencies of civilized conduct.'"  *Lewis*, 523 U.S. at 846-47 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  The standard for constitutional arbitrariness of executive action encompasses "'only the most egregious official conduct,' namely that which 'shocks the conscience'" and is "'intended to injure in some way unjustifiable by any government interest.'"  *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 U.S. at 846-47).  As illustrated by the remainder of the Court's analysis, law enforcement agencies have justifiable interests in regulating certain conduct related to cohesiveness among members, in addition to other concerns.  In any event, even assuming the FBI's regulations shocked the conscience, Plaintiffs' asserted right is not a fundamental one, a conclusion also explained herein.

[7]     The Court considers Plaintiffs' allegations of a Fifth Amendment right to privacy as analogous and indistinguishable from the courts have recognized as a Fourteenth Amendment right to privacy.  *See Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 941-42 (6th Cir. 2004) (explaining that intimate association and privacy rights find protection in the substantive component of the Fourteenth Amendment's Due Process Clause (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) and *Lawrence v. Texas*, 539 U.S. 558, 562 (2003)).  Courts have recognized that there are associational freedoms attached to the First Amendment. *Christensen v. County of Boone, Il.*, 483 F.3d 454, 462 (7th Cir. 2007) (recognizing "a right to associate for the purpose of engaging in those activities protected by the First Amendment" (citing *Jaycees*, 468 U.S. at 618)).  However, the freedom to enter into relationships is best analyzed under the liberty interest of the Fourteenth Amendment's Due Process Clause.  *Id.* at 463; *cf. J.B. v. Wash. Cnty.*, 127 F.3d 919, 927 (10th Cir. 1997) (noting that the right of intimate association that protects familial associations "is consonant with the right of privacy" and rooted in the Fourteenth Amendment's liberty interest (internal quotation marks and citations omitted)).

personal privacy includes such personal decisions as marriage, procreation, contraception, and

the right to engage in "certain intimate conduct."[8] *See, e.g., Lawrence v. Texas*, 539 U.S. 558,

562 (2003). The right exists whether a person is married or unmarried but remains limited to

only those "matters so fundamentally affecting a person" such as those indicated in *Lawrence*.

*Id.* at 565 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)).

The parties dispute the scope of the asserted right and whether such right is fundamental

or otherwise protected by the Constitution. Plaintiffs assert Fifth Amendment right to engage in

romantic relationships, which they allege is necessarily implicit in the accepted rights to privacy

within a marriage and to engage in consensual activity. (2d Am. Compl. ¶¶ 121-22.) During

oral argument, Plaintiffs argued that "the right that's been violated is the right to engage in a

romantic relationship with whoever you choose without having a supervisor tell you it's

immoral." Defendant characterized the asserted right as one involving romantic or sexual

relationships. Plaintiffs contend that the addition of "sexual" mischaracterizes their asserted

right, a contention that Mr. Stevens made in his EEO complaint. For the sake of making a

"careful" description of the asserted right, the Court will not necessarily characterize Plaintiffs'

claims as involving a sexual relationship.

---

Thus, because the parties only argue with respect to the intimate associations connected to due process and Plaintiffs do not allege that they "entered into [their relationship] for the purpose of 'speech, assembly, petition for the redress of grievances, or the exercise of religion,'" the Court constrains its analysis to whether Plaintiffs have a right to privacy protected by the Fourteenth Amendment. *See id.* at 462-63 & n.3 (quoting *Jaycess*, 468 U.S. at 618) (examining a couple's "right to intimately associate with one another" under the lens of the Fourteenth, rather than First, Amendment).

[8] A second category of privacy rights protected by substantive due process encompass an individual's "interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). This branch of privacy protection is not at issue in Count I.

However, the Court rejects Plaintiffs' construction of the asserted right as merely a status, rather than a right to engage in certain conduct. Plaintiffs attempt to draw a fine line between the two, arguing that "a romantic relationship is not really something a couple engages in; it is a status that exists between two persons." (Pls.' Opp'n at 7, Doc. 43.) To separate the status from the activities that flow from such a status would be an inefficient and unmanageable exercise, open to a different construction depending upon how any given couple chooses to conduct their relationship. Furthermore, Mr. Stevens's EEO complaint suggests that Plaintiffs indeed engaged in conduct on FBI property in connection with their relationship. In his EEO complaint, Mr. Stevens noted that during the September 27, 2011 meeting, he admitted that "he had slept in Ms. Denning's room, more often than not, from approximately week 6 or 7 at the Academy."[9] (Def.'s Ex. 5 at 4, Doc. 46-1.) Therefore, by his own admission, Mr. Stevens admitted that some conduct in connection with their relationship, even if not sexual, took place in the FBI dorm rooms where the NATs resided.[10]

Admittedly, there exists some uncertainty in the parameters of Plaintiffs' definition of this right they argue "implicitly" follows from those explicitly defined and recognized. Relying on the Supreme Court's declaration that "certain intimate human relationships must be secured against undue intrusion by the State," *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984), Plaintiffs contend that an unmarried couple's decision to maintain a romantic relationship falls under the protection of substantive due process. Plaintiffs cite a number of Supreme Court cases placing marriage, cohabitation with relatives, and unmarried homosexual

---

[9]     Ms. Hayek was known during the relevant time period as Katherine Denning. (2d Am. Compl. ¶ 14.) Thus, Mr. Stevens's EEO Complaint refers to his relationship with "NAT Denning." (Def.'s Ex. 5 at 3.)

[10]     Plaintiffs' First Amended Complaint also contained allegations admitting this fact. (*See* 1st Am. Compl. ¶ 42, Doc. 4.)

conduct within the purview of implied right to privacy. *See Lawrence*, 539 U.S. at 578-79; *Zablocki v. Redhail*, 434 U.S. 374, 383-84 (1978); *Moore v. E. Cleveland*, 431 U.S. 494, 501-06 (1977) (plurality opinion). From these findings, Plaintiffs argue, flows the conclusion that romantic relationships such as theirs, implicating "the bonds of love and intimacy" must be protected as "necessary to the concept of ordered liberty." (Pls.' Opp'n at 13.) In light of the brief length of Plaintiffs' relationship, it seems their contention is essentially that substantive due process should extend to the foundational decision of commencing a romance.

However, the Court finds no binding authority recognizing the right Plaintiffs invoke; indeed, those cases are distinguishable from the very particular slice Plaintiffs attempt to carve out of the privacy pie. In *Roberts*, the Supreme Court equated intimate association with highly personal relationships akin to "those that attend the creation and sustenance of a family—marriage; childbirth; the raising and education of children; and cohabitation with one's relatives." *Roberts*, 468 U.S. at 619. Plaintiffs' allegations fail to implicate any of these scenarios—nowhere do they indicate any intentions of marrying one another, procreating or rearing children jointly, or living with their respective relatives. The parties do not present any Supreme Court or Fourth Circuit case illustrating the Fifth Amendment's extension to and protection of a right of an unmarried couple to engage in a romantic relationship where such relationship bears no hallmark of familial decisions such as marriage, procreation, sexual intimacy, or even a long-term relationship suggestive of marriage. Plaintiffs vigorously oppose Defendant's attempt to lump Plaintiffs' activities into a category involving a sexual relationship, a decision that bears some constitutional protection as a result of *Lawrence*. Yet their attempt to draw this fine line places Plaintiffs' allegations in an area beyond the boundary of the Fifth Amendment's protection. Thus, upon an initial examination of this broad right to protection of a

16

non-familial romantic relationship, the Court will not recognize, without further guidance, that a fundamental right exists with respect to non-sexual, non-marital, dating devoid of any familial ties, as it would be an infeasible exercise to determine exactly when the pursuit of love finds shelter in the Due Process Clause. *Cf. Plummer v. Town of Somerset*, 601 F. Supp. 2d 358, 366 (D. Mass. 2009) (refusing to extend constitutional protection to the right to an intimate association outside the bounds of marriage or a civil union because "[i]t is impossible to draw a principled line demarcating the point . . . at which a romantic attraction is transformed from a dalliance into a prospective union worthy of constitutional protection").

Plaintiffs attempt to ascertain some persuasive guidance from the Court's sister district in *Equity in Athletics v. Department of Education*, 675 F. Supp. 2d 660 (W.D. Va. 2009). In *Equity in Athletics*, the Western District of Virginia noted that the freedom of private association protected certain types of intimate relationships. *Id.* at 673. However, the court declined to specify the extent of this protection, noting only that the relationships at hand—those between members of athletics teams who compete against and help to train one another—fell beyond the reach of constitutional protection. *Id.* It is a stretch to say, as Plaintiffs attempt to do, that recognizing the mere fact that the Constitution protects some intimate relationships somehow translates to a sufficient basis for assuming that Plaintiffs' activity falls within those intimate relationships protected by substantive due process.

Plaintiffs also rely heavily upon *Isenbart v. Board of County Commissioners of Kit Carson County*, No. 11-cv-03240-LTB-BNB, 2012 WL 4378269 (D. Colo. Sept. 25, 2012), for the proposition that substantive due process protects romantic relationships as an intimate

association.[11]  In *Isenbart*, the court recognized a "right to the freedom of intimate association,"
protected by the Due Process Clause, where the plaintiff pleaded the creation of a marital and
familial relationship. *Id.* at \*2. The plaintiff was a state employee who reported to the county
sheriff and at one point began dating the county undersheriff. *Id.* at \*1. The plaintiff and the
undersheriff eventually "moved in together and 'intended to create a familial relationship.'" *Id.*
The following year, the county sheriff-elect indicated that he would not employ both plaintiff
and the undersheriff, her partner, and the undersheriff subsequently resigned. *Id.* Three days
after the sheriff-elect entered office, the plaintiff provided paperwork indicating that she and her
partner considered themselves married. *Id.* Two months later, the sheriff terminated plaintiff's
employment. *Id.* In bringing a 42 U.S.C. § 1983 claim, the plaintiff alleged that she had entered
into an "intimate dating, marital, and familial relationship" worthy of constitutional protection.
*Id.* In assessing her pleadings, the district court determined that the plaintiff stated a
fundamental, protected right. *Id.* at \*2-3. The court reached this conclusion on the basis that the
complaint in that case sufficiently alleged a fundamental liberty interest by the plaintiff's
allegations that she "enter[ed] into an intimate dating, marital, and familial relationship with Mr.
Isenbart." *Id.* at \*3 (internal quotation marks omitted).

The Court finds *Isenbart* distinguishable, and actually contrary to, Plaintiffs' contentions
for the critical fact that the Fifth Amendment's intimate association protection does not extend to
those situations lacking hallmarks of marriage, sexual intimacy, or other indicia of long-term
relationships bearing close resemblance to those recognized by the Supreme Court. Plaintiffs

---

[11]      *Isenbart*, along with the appellate cases discussed further herein, discuss the existence of
the right to privacy in romantic relationships in the context of qualified immunity and whether
the right is clearly established. While qualified immunity is not before the Court, these
decisions, at the very least, demonstrate that there is uncertainty as to both the existence and
scope of a fundamental right in the context before the Court.

argue that similarities exist with *Isenbart* in the fact that the terminated parties were awaiting the finalization of a divorce at the time the infringed-upon relationships and that such relationship implicated a fundamental liberty interest. (Pls.' Opp'n at 8.) However, the similarities stop there and the facts material to *Isenbart*'s holding wholly differ from this case. The difference between Plaintiffs' and the facts in *Isenbart* arises in that the *Isenbart* plaintiff pleaded the intent to enter into a familial relationship at the time they began dating and eventually presented some indication that they entered into a marital relationship. *See Isenbart*, 2012 WL 4378263, at *3. In light of binding authority, the *Isenbart* court found this declared intention to be indicative of the existence of a fundamental, constitutionally protected right. *See id.* (citing *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) and *Grifin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993)). Plaintiffs here make no such allegations of familial or marital motives, possibilities, or intentions. Plaintiffs' intent to divorce their respective spouses does not somehow infer the existence of, or intent to create, the familial relationship that *Isenbart* recognized as sufficient to plead a fundamental, constitutionally protected right. *Isenbart* further noted that the fundamental interest in familial relationships does not clearly extend to "an extra-marital affair, dating relationship, or other romantic, non-marital relationship." *Id.* at *5-6 (citing the Sixth and Second circuits, as well as district courts within the First and Second circuits). Plaintiffs' situation could arguably be described with all three of these terms. The fact that Plaintiffs, like the individuals in *Isenbart*, were awaiting finalization of their divorce cannot attach a fundamental aspect to their relationship. Being that *Isenbart* distinguished between marital relationships and those merely involving romantic association or cohabitation outside of marriage, *Isenbart* offers no support to Plaintiffs' contention that this right to engage in a

19

romantic relationship disconnected from familial relationships is "necessarily implicit" in those privacy rights protected by the Constitution.

Plaintiffs' additional citations similarly fail to convince the Court that Plaintiffs' asserted right should be recognized as a right at all, let alone a fundamental one. Plaintiffs cite cases from the Sixth and Seventh circuits finding that the Constitution protects some non-marital romantic relationships. *See Christensen v. County of Boone, Il.*, 483 F.3d 454, 463-65 (7th Cir. 2007) (finding, in light of *Lawrence*, a protected intimate association where an unmarried couple had developed a long-term relationship); *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004) (holding that the plaintiffs entered into an intimate association where the individuals "lived together at some point, were romantically and sexually involved, and Anderson was monogamous in the relationship"). However, as *Isenbart* noted when acknowledging these two decisions, other appellate decisions have held that the right to privacy does not extend to all romantic or extramarital relationships. *See Marcum v. McWhorter*, 308 F.3d 635, 637-39 (6th Cir. 2002) (finding unprotected an extramarital relationship where a man, separated from his wife and awaiting divorce, cohabitated with a female companion who had recently moved out of her marital home and the two were sexually involved while cohabitating). While these Sixth Circuit decisions occurred prior to *LaVergne*, they share the common theme that an extramarital affair may arise even if the individuals involved are legally married to others while awaiting divorce, a description applicable to Plaintiffs' relationship here. Indeed, it is curious that Plaintiffs present these cases in support of their claims, when the individuals at issue were monogamous and sexually involved—the latter being a fact that Plaintiffs so vigorously argue sets this case apart from others upon which the Government relies. In any event, these extramarital considerations, especially in light of the uncertainty regarding the fundamental

nature of a right to engage in a non-marital, non-sexual romantic relationship, counsel hesitancy by the Court to adopt Plaintiffs' arguments based on *Christensen* and *LaVergne*.

In response to Plaintiffs' argument that their relationship falls within the purview of protection afforded by *Roberts*, the Court holds it simply does not, as it was extramarital and does not demonstrate those indicia or marital or long-term intentions presented in those cases identifying protected relationships. In *Roberts*, the Supreme Court explained that family relationships deserving of constitutional protection involve, *inter alia*, "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." 468 U.S. at 620. Accordingly, Plaintiffs argue that the relationship between them qualifies as one protected by the Constitution because it consisted of only two people, romantic relationships inherently implicate extreme selectivity in their beginning and continuation, and the relationship excluded all other individuals from its boundaries. (Pls.' Opp'n at 13.) However, as *McWhorter* noted, those three factors are not the exhaustive list by which a court determines whether a right is afforded constitutional protection. *See* 308 F.3d at 640-41. Instead, *Roberts* requires "a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." 468 U.S. at 620 (citing *Runyon v. McCrary*, 427 U.S. 160, 187-89 (1976) (Powell, J., concurring)). Those objective characteristics include long-term and familial intentions demonstrating the sort of highly personal relationship afforded fundamental protection. In *Beecham v. Henderson County, Tennessee*, 422 F.3d 372 (6th Cir. 2005), the Sixth Circuit disagreed with the district court's ruling that the plaintiff did not allege a protected

intimate association because she engaged in an adulterous relationship.[12] However, the facts in

*Beecham* involved a marriage proposal being made to the plaintiff, the couple's search of a place

to live together, discussions of "where they would live [and] the intimate details of their lives,

including raising children and the bond between husband and wife," and planning of "how to

merge their families," whether to have children together, and whether the plaintiff's daughter

would live with them. *Id.* These discussions, in the absence of any sexual involvement, "set

aside any issues involving [the plaintiff's] marital status." *Id.* Because not one of these many

indicators appears in the pleadings before the Court, the Court is unable to find that Plaintiffs'

relationship exhibited the characteristics of those highly personal bonds protected by substantive

due process. The consideration of Plaintiffs' omissions is one of significant importance in light

of the Supreme Court's directive that courts exhibit reluctance in expanding the list of implied

fundamental rights. *See Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 265-66 (4th Cir. 2005)

(citing *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc)).

---

[12]     Adulterous relationships fall beyond the reaches of intimate associations bound up in the
constitutional right to privacy. *See Marcum v. McWhorter*, 308 F.3d 635, 637-39 (6th Cir. 2002)
(finding unprotected an extramarital relationship where a man, separated from his wife and
awaiting divorce, cohabitated with a female companion who had recently moved out of her
marital home and the two were sexually involved while cohabitating); *cf. Bates v. Bigger*, 56 F.
App'x 527, 529 (2d Cir. 2002) (affirming summary judgment dismissal where plaintiffs'
entrance into an adulterous relationship fell beyond the First Amendment right to intimate
association). Facing arguments similar to those presented by Plaintiffs' here concerning the
*Roberts* factors, *McWhorter* held that the adulterous nature of the plaintiff's relationship was a
"pertinent" characteristic that "must be considered in determining where on the spectrum this
relationship lies." 308 F.3d at 640 (citing *Roberts*, 468 U.S. at 620). In considering this factor,
the Sixth Circuit held that an adulterous relationship fell short of the sorts of conduct "so deeply
rooted in the Nation's history and tradition or implicit in the concept of ordered liberty," in light
of the historical treatment of adultery as prohibited or otherwise discouraged. *Id.* at 641-42
(citing *Bowers v. Hardwick*, 478 U.S. 186, 194 (1986)). However, because the record before the
Court cannot place beyond question a sexual component of Plaintiffs' relationship, this factor is
not relevant at this time.

In sum, the Court finds that Plaintiffs do not assert a fundamental right to privacy encompassed by due process. Plaintiffs attempts to place the intimacy, and thus protection, of their relationship just below that of marriage. (*See* Pls.' Opp'n at 13.) The Court refuses to reach such a conclusion that would confer upon Plaintiffs' relationship the sort of protection that Plaintiffs seek. Their relationship, lacking the hallmarks of marital, familial, or otherwise long-term relationships, has not been established as the type of relationship the Supreme Court considered when invoking a right to privacy. Even if a Supreme Court or Fourth Circuit case clarified the fundamental nature of those dating relationships lacking marriage or familial implications, additional facts in Plaintiffs' case, as explained below, present even further questions as to the degree of protection afforded to such a right. For the reasons stated above, the Court holds that Plaintiffs' fail to assert a constitutionally protected right to enter into a non-marital, non-familial, romantic relationship.

### 2. *Degree of Protection Afforded to Plaintiffs' Activity*

The Court further holds that the asserted right to engage in a romantic, non-sexual, extramarital relationship was permissibly limited by the FBI in a manner that permitted the termination that occurred here. Having determined that Plaintiffs failed to allege a fundamental right, the Court proceeds to analyze Plaintiffs' substantive due process claim under rational basis scrutiny.[13] *Traficanti v. United States*, 227 F.3d 170, 175 (4th Cir. 2000) (citing *Glucksberg*, 521

---

[13]     Even if the right were a fundamental one, the Court would still apply rational-basis review so long as the FBI's policy did not "constitute[e] a direct and substantial interference with [Plaintiffs'] association." *LaVergne*, 371 F.3d at 882 (internal quotation marks and citations omitted); *see also Waters*, 57 F.3d at 426 ("Unless a law interferes directly and substantially with the fundamental right to marriage, it is not subject to strict scrutiny.").
     Direct and substantial interference arises where a rule prevents all who wish to exercise a right from doing so. *Waters*, 57 F.3d at 426; *cf. LaVergne*, 371 F.3d at 882 (explaining that such a burden arises "only where a large portion of those affected by the rule are absolutely or lately prevented from [forming intimate associations], or where those affective by the rule are

U.S. at 728). The FBI's rules limiting relationships between NATs will survive rational basis scrutiny so long as they are "reasonably related to a government interest." *Kendall v. Balcerzak*, 650 F.3d 515, 527 (4th Cir. 2011) (citations omitted). This highly deferential standard will uphold the Government's limitations so long as it "is rationally related to a legitimate state interest." *Willis*, 426 F.3d at 262.

The Supreme Court's recognition of the right to privacy in the context of personal relationships does not mean that no entity can regulate such relationships. *See Carey v. Population Servs., Inc.*, 431 U.S. 678, 686 (1977). Plaintiffs cite cases in which an employer could not proscribe an officer's private, off-duty personal activities. *See, e.g.*, *Shuman v. City of Philadelphia*, 470 F. Supp. 449, 459 (E.D. Pa. 1979). The Court remains mindful, however, that while there may be a right to privacy in relationships that occur outside of the workplace, there is no constitutional rule barring an employer from forbidding a personal relationship between government employees on government property. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006) (explaining that the government retains broader powers to regulate and control activity when acting as an employer, thus resulting in the possibility of certain limits upon a citizen's freedom upon entering government service); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 94 (1990) (Scalia, J., dissenting) (citing Supreme Court cases noting the permissibility of limitations

---

absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations]" (internal quotation marks and citations omitted) (alterations in original)).

Government policies restricting intra-office or intra-department relationships fall short of direct and substantial interference. *See Woodard*, 393 F. App'x at 127-28 (applying the rational basis standard to an anti-nepotism policy because "[a]t most, the [social services department]'s policy is an unwelcome hurdle, forcing Woodard to attempt to find a position outside [the agency] or to leave the County's employ altogether" (quoting *Waters*, 57 F.3d at 426) (internal quotation marks omitted)); *LaVergne*, 371 F.3d at 882 ("Because Anderson continued to enjoy the ability to form intimate associations with anyone other than fellow police department employees of differing rank, the department's policy is subject to rational basis review.").

24

on speech, privacy, and self-incrimination protections where a citizen works for a government agency). As noted below, such limitations have been expressly considered when ascertaining the exercise of a right of intimate association.

Here, the FBI's conduct regulations limited certain conduct on government property, including cohabitation or sleeping in a room at the FBI Academy other than one to which the NAT is assigned. (*See* Def.'s Ex. 1 at 23.) A regulation that may implicate certain aspects of relationships between fellow NATs is rationally related to the government interest of instilling and maintaining a certain code of conduct. *See Mercure v. Van Buren Tp., Mi.*, 81 F. Supp. 2d 814, 827 (E.D. Mich. 2000) (holding that concerns of cohesiveness among members of a police force justified prohibitions on relationships between the plaintiff and a fellow officer); *cf. LaVergne*, 371 F.3d at 882 (holding that a police department's policy prohibiting intra-office dating survived rational basis review and noting that "[s]uch preventative policies are common among government employers"). Plaintiffs offer no argument as to why these limitations are not rationally related to a government interest—presumably because they argue that their asserted right should be afforded strict scrutiny—and the Court does not find reason to depart from the deference of rational basis scrutiny here.

The only case presented to the Court that touches upon the scenario of a probationary government employee—which Plaintiffs' were by virtue of their new agent trainee status[14]— asserting a Fifth Amendment right to privacy addressing the employee's decision to engage in

---

[14]   The FBI Academy regulations identify that all new agents are probationary employees for their first twenty-four months of employment as a special agent, including the entirety of their time as NATs. (*See* Def.'s Ex. 1 at 1.) *See also Holbrook v. Reno*, 196 F.3d 255, 261-62 (D.C. Cir. 1999) (identifying new agent trainees at the FBI Academy as "probationary employee[s]"); *Desmond v. Gonzalez*, No. 03-1729, 2006 WL 5924388, at *3 (D.D.C. Jan. 17, 2006) (explaining that a document presented to FBI Academy trainees informed them they would be subject to a two-year probationary period).

intimate relationships is *Hoffman v. McNamara*, 630 F. Supp. 1257 (D. Conn. 1986). In *Hoffman*, the district court held that a police trainee could state a claim for an equal protection violation because he could not invoke a constitutional right to engage in sexual activity on government property, an activity forbidden by the police academy regulations. *Id.* at 1262. The district court noted that "[w]hile engaging in sexual intercourse may arguably be afforded some constitutional protection, this is not merely a case of the right to engage, in private, in sexual intercourse." *Id.* The difference, the court explained, is that the conduct occurred on government property "where the rules, at least implicitly, forbade such." *Id.* Thus, the court held, the plaintiff's claim was "far removed from any recognized category of privacy[.]" *Id.*

Plaintiffs maintain that *Hoffman* is inapplicable because it involved evidence of sexual activity at the summary judgment stage, while the Second Amended Complaint here contains no allegations of sexual activity. Notwithstanding the fact that the Government's Motion seeks dismissal on both Rule 12(b)(6) and Rule 56 grounds, the distinguishable fact of sexual activity does not diminish the usefulness of *Hoffman*. The ultimate resolution of *Hoffman* turned upon the police department's power to proscribe the conduct of its employees. This is directly analogous to the situation before the Court. Cohabitation and sleeping in another trainee's dorm room were forbidden by the FBI's conduct regulations governing NATs. (Def.'s Ex. 1 at 14.) Plaintiffs vigorously contend that the right they assert—the right to maintain a romantic relationship—is not the same as the right to engage in sexual intercourse. Indeed, Plaintiffs' concede the futility of any argument that they had the right to have sex on FBI property during their time as trainees, yet they maintain that the Government's presentation of *Hoffman* is inappropriate and misleading because the rights are different. (Pls.' Opp'n 7-8.) The Court does not accept Plaintiffs' argument as a reason to recognize an outcome different from that of

*Hoffman*, being that *Hoffman* is instructive on the degree of protection afforded to Plaintiffs' relationship, assuming such a right exists. Indeed, the right to engage in sexual relationships in private has been much more directly addressed by the Supreme Court in discussing the right to privacy. As noted above, the existence of a right to engage in an extramarital, non-familial, romantic relationship is less certain and the Court declines to recognize such a right as a fundamental one. Thus, if a firmly recognized constitutional right—to engage in a sexual relationship with a person of one's choosing—lacks protection in these circumstances, there is less reason to recognize constitutional protection for activity that is not firmly recognized as existing under the Fifth Amendment.

With respect to determining the Government's right to restrict certain aspects of employee behavior, Plaintiffs' situation resembles *Hoffman* and the other cases that recognize government agencies, especially those in law enforcement, curb on public property what may be more broadly protected in private. *Cf. Shawgo v. Spradlin*, 701 F.2d 470, 482-83 (5th Cir. 1983) (upholding a police department's rule prohibiting officers from cohabitating with officers of equal or lesser rank). It follows that this broader latitude supports a conclusion in line with *Hoffman* and *Shawgo*, permitting regulations allowing for discipline or dismissal as a result of Mr. Stevens's act of sleeping in Ms. Hayek's room.

For these reasons, the Court grants Defendant's Motion to Dismiss Count I, violation of the Fifth Amendment right to privacy to enter into romantic, non-familial relationships, because it is not necessarily implicit in the recognized fundamental rights to engage in intimate association, nor is it entitled to heightened scrutiny that would require the Government to permit the activity Plaintiffs' sought to engage in.

27

## B. Plaintiffs' Equal Protection Claim

The Court also grants Defendant's Motion to Dismiss Count II because Plaintiffs fail to demonstrate a fundamental right or differential treatment of similarly situated individuals.

To establish an equal protection violation, Plaintiffs "must plead sufficient facts to demonstrate plausibly that [they were] treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). In the equal protection context, "similarly situated" means that the individuals "are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Upon a showing of differential treatment of a similarly situated individual, the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (quoting *Garraghty*, 239 F.3d at 654). Just as with substantive due process, equal protection violations apply rational basis review where a fundamental constitutional is not at stake. *See, e.g., U.S. v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (citations omitted). The Court finds that Plaintiffs fail to meet either prong of the equal protection pleading requirements.

Plaintiffs fail to allege the existence of individuals similarly situated so as to form the basis of an equal protection comparison. Plaintiffs present allegations of other trainees who violated the curfew rule and other conduct regulations yet were not terminated by the FBI. (*See* 2d Am. Compl. ¶¶ 76, 78-95). However, Plaintiffs' inclusion of these individuals fails to demonstrate that they are alike in all relevant aspects to Plaintiffs. Plaintiffs argue that they present evidence of trainees who broke rules and were treated differently, with the one relevant difference being Plaintiffs' choice to engage in a romantic relationship. Even setting aside this

28

difference, as it is the basis of Plaintiffs' attempt to fulfill the discriminatory animus prong, these comparative examples fail to show likeness in all relevant aspects. The Second Amended Complaint remains devoid of an indication as to how many times these other individuals broke curfew, in comparison to the times Plaintiffs' broke curfew. When questioned by the Court at oral argument as to how these other individuals were similar, Plaintiffs' counsel argued that "all broke some rule in some way." Such vagaries simply cannot pass muster. It would be imprudent to compare the treatment of an individual who violated "some rule" once to that of an individual who broke a different rule of a different magnitude at a different frequency in a shorter or longer time span. Considering those two hypothetical individuals alike in all relevant aspects would be an impractical stretch in reasoning. Furthermore, nothing in the Second Amended Complaint indicates that these other trainees were sleeping in the dorm rooms of other trainees, another one of Plaintiffs' rule violations. Simply asking for the Court to presume all relevant aspects to be alike just because other trainees broke various rules does not satisfy the Court that the scenarios were so similar that all involved were so alike, the existence of the romantic relationship would be seen as the only difference and thus the reason for termination here.

Plaintiffs' allegations also fall short of the requirement that the Second Amended Complaint demonstrate that the Government's decision could not be justified under the proper level of scrutiny. As an initial matter, the Court finds that rational basis scrutiny is appropriate here, contrary to Plaintiffs' argument. Plaintiffs aver that strict scrutiny should apply to decisions interfering with the right to intimate association. *See Zablocki*, 434 U.S. at 383. The Court does not dispute that strict scrutiny applies to the exercise of a fundamental right. The deficiency in Plaintiffs' argument is that *Redhall* discussed the fundamental right to marry,

29

something Plaintiffs do not and cannot invoke. As demonstrated above, the Court disagrees with Plaintiffs' contention that the right they seek to invoke is both well-established and non-controversial. Having already found questionable the existence of Plaintiffs' asserted right to engage in a non-marital, non-familial romantic relationship or that such a right falls within the spectrum of associations so fundamental that they require the strictest of scrutiny, the Court rejects Plaintiffs' plea for a strict scrutiny analysis. Indeed, the application of strict scrutiny to a right that may not exist in the manner which Plaintiffs attempt to define it would be imprudent to say the least.[15]

Upon a rational basis consideration, the Court finds permissible the Government's limitation on personal romantic relationships and other conduct at issue here. Under rational basis review, courts generally uphold governmental decisions that are rationally related to a state interest. *Giarranto v. Johnson*, 521 F.3d 298, 302-03 (4th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)). This is a deferential standard, placing the burden on Plaintiffs "to negate every conceivable basis which might support" the governmental action. *Id.* (quoting *Legnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The Court notes that Plaintiffs' brief fails to explain why the limitations on cohabitation and romantic relationships would not survive a rational basis examination. Plaintiffs' only argument about the irrationality of the Government's actions here appears in the Second Amended Complaint, wherein Plaintiffs state that no interest exists in regulating romantic relationships between trainees that occur when off-duty and do not interfere with their work performance. (*See* 2d Am. Compl. ¶ 131.)

---

[15] For the same reasons, the Court also rejects the application of heightened scrutiny, something Plaintiffs seek by way of their Second Amended Complaint but fail to argue in their brief.

To the contrary, courts have recognized the reasonableness of proscriptions on a law enforcement officer's ability to cohabitate or engage in personal, intimate relationships with coworkers. *See Shawgo*, 701 F.2d at 482-83. Applying the rational basis standard, the Fifth Circuit in *Shawgo* found a rational connection of a police department's regulation of off-duty activities of its employees, including limitations on sharing an apartment with those of equal or lower rank. *Id.* at 483. The facts before the Court present even stronger case than that in *Shawgo*, as those police officers lived in non-governmental housing, whereas Plaintiffs' and their fellow trainees resided in government-owned dorms. Even assuming the comments that the dorm rooms would be treated as private space—which alone the Court does not accept as sufficient to indicate "off-campus" residence—acceptance of Plaintiffs' argument that these residences were somehow private would not affect the application of *Shawgo* here. Certainly, the considerations presented by the various reviews and assessments set forth concerns regarding judgment and discipline, factors that could easily serve as the basis for the FBI's limitations. Accordingly, the Court finds that there is a rational basis for the FBI's restrictions on romantic relationships and cohabitation.

For these reasons, the Court should grants Defendant's Motion to Dismiss Count II and dismisses Plaintiffs' equal protection claim.

### C. FLSA Violation

The Court grants Defendants' Motion to Dismiss Count VII because the Second Amended Complaint fails to demonstrate that Plaintiffs engaged in the sort of "productive work" necessary to trigger overtime compensation for entry-level employees. Furthermore, the allegations fail to establish that the hours Plaintiffs worked outside of their regular working hours were "regularly scheduled" overtime hours for which they were entitled to compensation.

Under the FLSA, "[n]o employer shall employ any of his employees . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his [work in excess of forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). In implementing the FLSA, "[a]n agency shall compensate [a nonexempt] employee . . . for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and a half times the employee's hourly regular rate of pay." 5 C.F.R. § 551.501(a). However, most significant to the facts before the Court, "[t]ime spent in apprenticeship or other entry level training . . . outside regular working hours shall not be considered hours of work, provided no productive work is performed during that period." 5 C.F.R. § 551.423(a)(3).

Regulations implementing the FLSA define "regular working hours" as "the days and hours of an employee's regularly scheduled administrative workweek . . . ." 5 C.F.R. § 551.421. "Work that is *scheduled in advance of an administrative workweek*" constitutes the "regularly scheduled administrative workweek." 5 C.F.R. § 610.111(a)(2) (emphasis added). This includes the "40-hour basic workweek" and "the period of regular overtime work, if any, required of each employee." *Id.* "Thus, under [Office of Personnel Management] regulations implementing the FLSA, an employee who has been scheduled in advance for entry level training for more than forty hours in a workweek *must* receive overtime pay." *United States v. Moreno*, 88 Fed. Cl. 266, 270 (Fed. Cl. 2009) (emphasis in original).

The Court recognizes an important distinction between 5 C.F.R. § 551.423(a)(2) and § 551.423(a)(3). Plaintiffs' Second Amended Complaint and arguments in opposition to Defendant's Motion attempt to invoke subsection (a)(2) in support of their claim. However, subsection (a)(3) explicitly notes its applicability to entry-level or apprentice-type employees.

Plaintiffs' allegations indicate they were accepted into an FBI training program as new agents employed in a probationary capacity. It follows that they were no more than entry-level employees, if not more likely to be apprentice-type employees. Accordingly, the Court finds misplaced their reliance on § 551.423(a)(2) and *Bull v. United States*, 68 Fed. Cl. 212 (Fed. Cl. 2005), which applies that provision.

Plaintiffs offer *Bull* for the proposition that they need not address the issue of "productive work" as exemplified in § 551.423(a)(3). In *Bull*, the Court of Federal Claims set forth the elements for employees to prevail on a FLSA overtime claim, which are (1) the plaintiff engaged in the activity for the employer's benefit, (2) the employer knew, or reasonably should have known, of the activity, (3) the employer controlled or required the activity, and (4) the hours of work performed were not *de minimis*. *Id.* at 220. The court explained that "work" under the FLSA would exclude activities preliminary or postliminary to the principal goal of the employee's work. *Id.* at 221-22. *De minimis* work is defined by § 551.412 as that which is limited to ten minutes or less per occurrence per day. *Id.* at 226. While *Bull* extensively discusses the various elements and sub-elements of a FLSA overtime claim, the decision addressed § 551.423(a)(2), not subsection (a)(3) that applies to entry-level employees. Thus, the Court rejects Plaintiffs' contention and abstain from reading *Bull* as permitting Plaintiffs, as entry-level new agent trainees, to proceed without consideration of the "productive work" language set forth in § 551.423(a)(3).

The Court holds that Plaintiffs fail to demonstrate "productive work" such that the Second Amended Complaint sufficiently presents the required elements of the applicable regulation. Plaintiffs offer no argument on whether their cleaning of gym equipment was productive work under § 551.423(a)(3), as they erroneously contend that this is not the

33

applicable regulation. In any event, the Eleventh Circuit provides some guidance on the scope of

"productive work" in the FLSA context. In *Dade County, Florida v. Alvarez*, 124 F.3d 1380

(11th Cir. 1997), the Eleventh Circuit held that, in light of federal regulations, a police unit's off-

duty physical training did not constitute productive work because they were employed to respond

to life-threatening situations. *Id.* at 1385. Therefore, physical training fell beyond the scope of

the officers' principal and primary activity, despite the argument that off-duty training was

necessary to maintain the physical fitness standards necessary to response to high stakes

situations. *Id.* at 1384-85. Here, Plaintiffs' allege activity even less integral to their

performance—the cleaning of exercise equipment. It is hard to believe the Court should permit

the cleaning of equipment to fall within productive work if other courts have concluded that the

actual physical training of law enforcement officials, even when off-duty, fails to qualify as

productive work. For this reason alone, the Court finds the Second Amended Complaint

insufficient to state a claim under the entry-level employee requirements of the overtime

provisions.

Turning to the issue of the regularly administrative workweek, the Court finds guidance

in recent the *Moreno* decision from the Court of Federal Claims. *Moreno* affirmed that

employees who are scheduled to work in excess of their regular administrative workweek are

entitled to overtime compensation. *Moreno*, 88 Fed. Cl. at 271. In *Moreno*, employees at the

United States Department of Homeland Security ("DHS") were regularly scheduled to attend

five days of training at the Federal Law Enforcement Training Center. *Id.* at 268, 271. After the

events on September 11, 2011, however, trainees were required to regularly attend a sixth day of

training during their workweek. *Id.* at 270-71. DHS trainees were not provided overtime

compensation because the individual responsible for payroll wrongly assessed that "regular

working hours" only constituted the basic forty-hour workweek. *Id.* at 271. The court held that because the sixth day was regularly scheduled, that day constituted "regular working hours" and warranted overtime compensation. *Id.* at 272; *cf. Bull v. United States*, 68 Fed. Cl. at 239 (finding U.S. Customs employees entitled to compensation for laundering and processing towels off-duty because it was an integral part of training a dog to detect contraband). The Court notes that while *Moreno* and *Bull* provide some guidance on the elements for overtime pay, neither case applies the entry-level provision, 5 C.F.R. § 551.423(a)(3), to their facts.

The Court holds that Plaintiffs fail to establish the parameters set forth for compensation of entry-level employees. Plaintiffs allege that the FBI violated the overtime pay provisions of the FLSA because they were assigned a take-home exam and other work in excess of forty hours in a given week. (2d Am. Compl. ¶¶ 185-87.) Specifically, Plaintiffs allege that the FBI "regularly required the Class to work more than 40 hours in a workweek: Approximately three times each week (typically Monday, Wednesday, and Friday), NATs were required to spend an hour cleaning and preparing gym equipment for readiness the following day." (*Id.* ¶ 53.) Plaintiffs also allege that they received a take-home exam on September 16, 2011, and their supervisors required Plaintiffs to complete the exam over the weekend. (*Id.* ¶ 47.) As entry-level trainees in the NAT program, Plaintiffs may only recover overtime compensation if the FBI "regularly scheduled" their assignments "in advance of an administrative workweek." *See* 5 C.F.R. §§ 551.423(a)(3), 610.111(a)(2). Nothing in the Second Amended Complaint alleges that the FBI "regularly scheduled" the exam in advance.

Even assuming the truth of the allegations that the FBI regularly required Plaintiffs and other trainees to clean equipment after hours, this cleaning requirement fails for the reasons explained above regarding productive work. Plaintiffs' choice to argue the § 551.423(a)(2)

35

standard rather than the § 551.423(a)(3) standard that specifically governs entry-level employees, which Plaintiffs were, provides no further reason for finding Plaintiffs successfully established the elements of a FLSA claim as defined by the appropriate regulations. Even in applying the § 551.423(a)(2) language, Plaintiffs' fail to state a claim with regards to the allegedly regularly scheduled cleaning because cleaning equipment does not have the purpose of "improv[ing] Plaintiffs'] performance of the duties and responsibilities" of an FBI agent. 5 C.F.R. § 551.423(a)(2)(ii). It is plausible that exercise or physical training occurs for the purpose of improving performance of agent duties, but cleaning machines does not have such a purpose.

For these reasons, the Court grants the Motion to Dismiss Count V because Plaintiffs fail to state a claim for overtime payment under FLSA.

### D. Plaintiffs' Remaining Claims

The Court also dismisses Counts III and IV, alleged against John Doe, for failure to timely serve. The 120-day service period begins at the time the complaint is filed. An amended complaint only resets the 120-day period as to newly named defendants. *See Convergence Techs. v. Microloops Corp.*, 711 F. Supp. 2d 626, 631 n.4 (E.D. Va. 2010). Here, John Doe has been named in all three of Plaintiffs' complaints, the first of which was filed in October 2012. Because the time for service has expired and Plaintiffs have failed to serve John Doe, the Court dismisses Counts III and IV.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss and Motion for Summary Judgment. Count I fails to present a substantive due process violation, as Plaintiffs' do not assert a Fifth Amendment right to privacy to form romantic, non-marital and non-familial relationships and, even if such a right existed under the Fifth Amendment, the

Government's restriction on relationships and cohabitation did not unlawfully infringe on such a right.  Count II fails to allege an equal protection violation because Plaintiffs fail to present (1) disparate treatment of similarly situated individuals and (2) that the Government's actions do not withstand rational basis scrutiny.  Count V fails present the requirements outlined by the FLSA regulations applicable to entry-level employees, such that Plaintiffs state a claim for a FLSA violation for failure to pay overtime compensation.  Accordingly,

It is hereby **ORDERED** that Defendant's Motion to Dismiss (Doc. 37) is **GRANTED;**

It is further **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 38) is **GRANTED**; and

It is further **ORDERED** that this action is **DISMISSED with prejudice** because Plaintiffs' have now pleaded their claims three times and no further amendment may demonstrate (1) that their situation gives rise to a fundamental constitutional right that would alter the aforementioned due process and equal protection analysis and (2) that they were not entry-level employees for FLSA purposes.

This Order closes the case and the Clerk is directed to remove it from the active docket.

**IT IS SO ORDERED.**

ENTERED this 16th day of August, 2013.

Alexandria, Virginia
8 / 16 / 2013

                                             /s/
                        _____
                        Gerald Bruce Lee
                        United States District Judge